10 CIV 9648

Jason M. Drangel (JMD 7204)
EPSTEIN DRANGEL LLP
Attorneys for Plaintiffs
60 East 42nd Street, Suite 2410
New York, NY 10165
Tel: 212-292-5390
Fax: 212-292-5391

Laurence Singer (LS 4250)
Attorney at Law
1629 K Street NW, Suite 300
Washington D.C. 20006
646 327-8772

*Of Counsel*
*Pro Hac Admission Pending*



RECEIVED
DEC 20 2010
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

2FA TECHNOLOGY, LLC
Plaintiff

v.

ORACLE CORPORATION, a Delaware
Corporation, and PASSLOGIX, INC.,
a Delaware corporation and
wholly owned subsidiary of ORACLE
CORPORATION,
Defendants

Case No.:

**JURY DEMANDED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiff 2FA Technology LLC ("2FA" or "Plaintiff") for its Complaint against

Defendants Oracle Corporation ("Oracle") and Passlogix Inc. ("Passlogix"), (individually

and collectively referred to as the "Defendants"), alleges as follows based on its personal

knowledge as for itself, and on information and belief as to the acts of others:

## I.     INTRODUCTION

1.     This case is about a conspiracy and corporate theft, by Passlogix, Inc., a wholly owned subsidiary of Oracle Corporation. Led by the President and Marc Boroditsky, Passlogix's Chief Executive Officer and Marc Manza, Passlogix's Chief Technology Officer, and with active participation of Passlogix's senior management team, the activities undertaken by Passlogix were designed to: 1) deprive 2FA of earned royalties; 2) force 2FA into bankruptcy; 3) steal 2FA's confidential information and intellectual property; and 4) use the confidential information and intellectual property stolen from 2FA for their own commercial gain.

2.     2FA brings this lawsuit after discovering that Passlogix used 2FA's confidential information and intellectual property, embodied in know-how, documentation and computer source code, and then undertook a systematic scheme to deprive 2FA of the benefits of its contractual relationship with Passlogix, and steal 2FA's confidential information and intellectual property for its own, and for Oracle's commercial benefit.

3.     Passlogix stole thousands of proprietary documents other confidential materials, much of it embodied in 2FA's know-how, documentation, and source and object code ("the Materials"). These Materials represent trade secrets and other proprietary information that 2FA invested millions of dollars to create.

4.     Passlogix then used the ill-gained storehouse of 2FA's Materials to develop new software components for their existing Passlogix and Oracle software products, as well as to develop new products all with the intended strategy of making their company more attractive to a prospective acquirer.

## II.    THE PARTIES

5.      2FA Technology LLC is a Texas limited liability company with its principal place of business located at 930 S. Bell Boulevard, Suite 402, Cedar Park, Texas 78613. 2FA is an enterprise software company focused on the development of security software that manages and facilitates secure access to computers and computer based networks.

6.      Passlogix, Inc. is a Delaware corporation, a wholly owned subsidiary of Oracle Corporation, with its principal place of business at 75 Broad Street, Suite 815, New York, New York 10004. Passlogix was established in 1996, has more than 2500 customers, and sold more than 22,000,000 licenses.

7.      Oracle Corporation is a Delaware corporation with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065.

## III.    JURISDICTION AND VENUE

8.      Jurisdiction in this action is based on 28 U.S.C. § 1332 because the matter is between citizens of different states and exceeds the sum of $75,000, exclusive of interests and costs. Jurisdiction is also based on §§ 1331, 1338, 1367 and 2201.

9.      This Court has personal jurisdiction over the Defendants because, among other things, Defendants do business in this jurisdiction, and because Defendants have committed acts that caused injury within this jurisdiction.

10.     Venue in this District is appropriate, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the dispute occurred in this District, a substantial part of the property that is the subject of the action is situated in this District, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

COMPLAINT                              3

## IV.   BACKGROUND

11.    In April 2006 2FA and Passlogix entered into a License Agreement under which 2FA granted Passlogix a license to its software under very restrictive terms.

12.    At the time of signing the License Agreement Passlogix did not possess strong authentication expertise.[1]

13.    At the time the parties executed the License Agreement, 2FA was a new company deeply focused on strong authentication and credential management, with Passlogix as its sole customer.

14.    Passlogix was outwardly a growing company that developed enterprise software designed to reduce the number of passwords an employee was required to manage to facilitate access to enterprise applications. At the time of signing the License Agreement Passlogix had nearly 500 customers, but desired to add strong authentication to its product line to effectively grow and compete in the market.

15.    Several months after 2FA and Passlogix signed the License Agreement, Passlogix entered into a license agreement with Oracle. For the majority of the term of the 2FA/Passlogix License Agreement, Oracle was a business partner of Passlogix, selling rebranded Passlogix software as their own under the Oracle eSSO brand name.

---

[1] Strong authentication includes two-factor authentication, a term of art in the software security industry, is achieved when a user authenticates to a computer or computer network with more than one form of authentication, such as a password and a physical device. The process is very similar to the manner in which an ATM banking authentication occurs with a "smart card" and PIN.

COMPLAINT                              4

16.    In 2007, Oracle and Passlogix were engaged in negotiations for an Oracle acquisition of Passlogix. For undisclosed reasons the transaction was not completed.

17.    In August 2008, 2FA and Passlogix ended their relationship through the creation of an amendment to the License Agreement. Amendment B represented the winding down of the License Agreement and included again restrictive provisions and obligations to which Passlogix was expected to comply.

18.    In December 2008, 2FA served Passlogix with a formal notification of breach and termination asserting among other things nonconformance with Passlogix's contractual obligations and misappropriation of 2FA's intellectual property.

19.    Three days later Passlogix sued 2FA for breach of contractual obligations and other claims (Civ. Action No. 08-CV-10986). 2FA countersued Passlogix for breach of contractual obligations, misappropriation, and other claims.

20.    In September 2009, 2FA sent a notice to Mr. Amit Jasuja, a Vice President at Oracle, that 2FA had active claims against Passlogix for misappropriation of trade secrets and intellectual property and breach of contract and that Oracle was selling rebranded Passlogix software that contained trade secrets misappropriated from 2FA.

21.    On October 2, 2010, Oracle announced its acquisition of Passlogix.

22.    On the day of Oracle's announcement, Oracle's market capitalization increased over $1 billion. Industry analysts credited the increase of Oracle's market capitalization to the Passlogix acquisition.

23.    On or about November 1, 2010, Oracle completed the transaction for an estimated $42 million.

## V.     PASSLOGIX'S PRODUCTS

24.     Passlogix's suite of solutions is sold under the brand v-GO Access Accelerator Suite and now contains four software products: 1) v-GO Single Sign-on (v-GO SSO), 2) v-GO Universal Authentication Manager (v-GO UAM), 3) v-GO Self-Service Password Reset (v-GO SSPR), and 4) v-GO Provisioning Manager (v-GO PM).

25.     v-GO UAM is Passlogix's only strong authentication product.  During the term of the relationship with 2FA, Passlogix also sold v-GO Authentication Manager (v-GO AM) (which has now been merged into v-GO SSO) and v-GO Credential Manager (v-GO CM). v-GO CM is Passlogix's name for the software licensed by 2FA under the License Agreement. v-GO CM was discontinued in August 2008.

## VI.     2FA'S TECHNOLOGY

26.     Greg Salyards, 2FA's President and CEO and Shaun Cuttill, 2FA's Chief Technology Officer, are the founders of 2FA. Together they have more than twenty years of experience in the still emerging strong authentication and credential management technologies.

27.     A credential management system in the software security industry is a software system created to facilitate authentication events and manage the lifecycle of credential related data that is bound to an individual and facilitates authentication events. Credentials may include smart cards, contactless cards, one-time password tokens, digital certificates, biometrics, and other physical or logical devices.

28.     2FA was created with the vision of simplifying strong authentication, and through the creation of credential management systems that were capable of managing many

COMPLAINT                                    6

different authentication devices from multiple vendors. 2FA's vision was unique then and remains unique in the marketplace today.

29.     2FA's customers are larger companies in the security software industry that purchase licenses granting them limited rights to utilize specific 2FA software programs. 2FA does not sell ownership rights to its software to its customers and it retains all intellectual property rights in these works.

30.     For 2FA, revenue comes from three basic activities: (a) licensing the underlying software, which is in the form of an upfront and royalty payments, (b) consulting relating to the implementation and operation of the software, and (c) supporting end users with maintenance, support, and upgrades.

### VII.    THE LICENSE AGREEMENT

31.     In late 2005, Passlogix realized that if it was to compete effectively in the enterprise marketplace, it needed to offer a more complete and comprehensive software suite. Passlogix believed it needed to provide strong authentication and credential management products.

32.     Passlogix could have bought an existing strong authentication and credential management company, built their own new strong authentication and credential management product, or they could have partnered with a company who provided these products.

33.     Passlogix elected to partner. Partnering posed the lowest cost and fastest entry into the market.

34.     In March 2006, Passlogix engaged in negotiation with 2FA to enable Passlogix to address the absence of strong authentication and credential management capabilities

within the Passlogix product line.

35. The parties agreed that a license agreement would be the best approach to form a fruitful relationship.

36. On April 24, 2006, 2FA and Passlogix entered into a License Agreement, which subsequently was amended four times.

37. At the outset of the relationship 2FA and Passlogix were very different software companies, each specializing in their own special area of technology.

38. The License Agreement clearly delineated these two specialty areas. The License Agreement defined the Parties specialty areas as:

> a. Passlogix develops and markets authentication and identity-management solutions for its customers; and
>
> b. 2FA has developed and owns certain software and related technology for managing user identity on smart cards, and other authentication methods generally considered as "strong authentication" or "two-factor authentication", including, but not limited to, one-time password, biometrics, and other token form-factors used, with specific regard to establishing and managing identities associated with those various factors of authentication.

39. The License Agreement was to serve as the basis of collaboration for Passlogix to grow a strong authentication and credential management business and the License Agreement called for 2FA to modify its credential management software to allow Passlogix to rebrand the software and sell its as Passlogix's v-GO CM.

40. As one of its obligations under the License Agreement, 2FA was to provide

Passlogix with its source code.

41.    2FA's source code is its most important and protected asset.

42.    2FA maintains its source code on highly secured servers with privileged access rights. Each access to the serves is logged and recorded. Only development and engineering personnel with a need to access 2FA's source code as a normal part of their responsibilities are permitted access to the servers. For example, Mr. Salyards, the 2FA President and CEO, has never had access to 2FA's source code because his duties are specific to management and not development or engineering.

43.    2FA's License Agreement with Passlogix defines 2FA's confidential information to include, without limitation, 2FA's software, its object and source code, and any associated documentation or service offerings.

44.    The party receiving party Confidential Information agrees not to disclose the Confidential Information to any person, other than those employees, agents, consultants and contractors whose use of or access to the Confidential Information is necessary in connection with the receiving party's exercise of the rights granted to the receiving party hereunder, and who have agreed to maintain the confidentiality of the Confidential Information and to limit their use thereof in accordance with the terms of this Agreement.

45.    2FA's License Agreement with Passlogix states that the receiving party must use the same degree of care to avoid unauthorized disclosure of Confidential Information (but in no event less than a reasonable degree of care) as it employs with respect to its own confidential and proprietary information of like importance.

46.    2FA's License Agreement with Passlogix states that Confidential Information provided or communicated to the receiving party shall remain the property of the

disclosing party.

47.    As defined in the License Agreement, "Software" specifically was defined as, "…
(a) 2FA CMS software in both Source Code and Object Code format and (b) the
Middleware in Object Code format as more particularly described in Appendix A,
together with any updates, modifications, corrections, enhancements or new versions of
such software, and supporting documentation therefore, to the extend made available by
2FA to Passlogix in accordance with the terms of this Agreement.

48.    The License Agreement contained an "Exclusive Source" provision that
precluded Passlogix from developing a credential management system for two years after
termination of the License Agreement. In the License Agreement, Passlogix agreed that it
(either itself or through consultants or third-party contractors) would not use, sublicense,
market, promote, demonstrate or distribute any CMS (Credential Management System)
other than the Software [provided by 2FA] as Passlogix's primary CMS solution,
"…during the term of this Agreement for two years following termination...".

49.    The License Agreement gave Passlogix "… the right to terminate the License
Agreement at any time, without cause, upon sixty (60) days prior written notice to 2FA".
Passlogix elected not to exercise this right under the License Agreement.

50.    The License Agreement gave Passlogix the exclusive right to purchase "… all
2FA intellectual property relating to the Software owned by 2FA …" according to agreed
upon calculations. Passlogix elected not to exercise this right under the License
Agreement.

51.    At all times during the term of the 2FA/Passlogix License Agreement, 2FA
fulfilled all of its contractual obligations.

## VII   v-GO CM

52.     On June 12, 2006, Passlogix released a press release stating, "Separately today, Passlogix announced v-GO Credential Manager™ [the rebranded 2FA software], the sixth product in the v-GO suite. v-GO CM is the market's first open lifecycle management system for strong authentication devices. It can be used to issue, manage and revoke smart cards, tokens, biometrics and proximity cards governing any point of physical or logical entry, from garage gate and front door to VPN, network and application sign-on."

53.     On that same day, June 12, 2006, referring to v-GO CM, Mr. Boroditsky conducted his first public interview regarding v-GO CM with Mr. John Fontana from NetworkWorld.com. In the interview, Mr. Boroditsky stated, "Providing the tools so it is easy to handle all those scenarios in one central fashion is the goal," and, "And we do it so you are not locked into any one vendor. That is key to our offering. We support any type of smart card and reader, any middleware, directory or PKI infrastructure."

54.     The later feature described by Mr. Boroditsky was the trade secret Passlogix would misappropriate from 2FA in the coming months.

55.     In June 2007 v-GO CM was evaluated by a leading third-party security industry publication that in its review referred to v-GO CM to as the "shining star of Passlogix's software suite."

56.     In August 2007, Passlogix released v-GO CM, version 6.0. In the release notes, Passlogix stated, "v-GO CM now introduces dynamic CSP-switching. This feature enables v-GO CM to seamlessly accept cards not only from different manufacturers, but also with multiple middleware-providers on the same system, without administrators or

users needing to know the difference between cards."

57.    Passlogix set the fair market value of v-GO CM between $40.00 and $8.00 per license, plus 20% for annual maintenance and support. v-GO CM was sold to several Passlogix customers at a range between $16.50 and $27.00 per license.

## VIII   PASSLOGIX'S ACTIONS

58.    Once the 2FA/Passlogix License Agreement was signed, Passlogix used its leverage to create an environment that caused significant operational and financial difficulties for 2FA.

59.    Throughout the term of the 2FA/Passlogix License Agreement, and until today, Passlogix was and is in possession of 2FA's Materials.

60.    On July 7, 2006, several days after 2FA delivered the first build of the new product, Passlogix informed 2FA that it was halting all discussions with Passlogix's OEM customers – such as Oracle and IBM – about selling the v-GO CM software package. This decision severely limited 2FA's revenue potential and denied 2FA marketing opportunities that constituted an important part of 2FA's decision to sign the License Agreement with Passlogix.

61.    Unbeknownst to 2FA, on July 26, 2006, a Mr. Gregory Simeone, a Passlogix Product Manager, emailed source code belonging to 2FA to internal Passlogix personnel. Many personnel copied on the email, such as management, marketing, quality assurance, documentation, and business development personnel, had no requirement to access 2FA's source code.

62.    Mr. Simeone was reprimanded by Passlogix engineering management for emailing 2FA's source code and was instructed to place the source code on a secured

server which Passlogix utilized for its own source code. No action was taken to recover the source code from the individuals who did not require access.

63.    During the course of the relationship, Passlogix personnel emailed the majority of 2FA's intellectual property, including its source code, to internal personnel. Passlogix amassed a huge library of 2FA Material containing nearly 100,000 pages and hundreds of thousands of lines of source code.

64.    Among the provisions of the License Agreement, 2FA was to be Passlogix's Exclusive Source for "...software components listed in Appendix A", which included, but was not limited to: Credential Management System software, client software known as Middleware that interfaced with token devices, such as: PKCS and CAPI.

65.    Starting April 25, 2006, Passlogix continued to develop software that interfaced with token devices, specifically CAPI, through the enhancement to its own products, specifically: v-GO SSO, v-GO AM, and v-GO SM, and eventually v-GO UAM product.

66.    On April 24, 2007, while having access and reviewing 2FA's source code, Passlogix developed software that interfaced with token devices, specifically PKCS #11, through the enhancement of its v-GO SSO, v-GO AM, and v-GO SM, and eventually its v-GO UAM products.

67.    On April 27, 2007, Passlogix presented its own credential management solution, to a third-party prospect.

68.    On June 2007, 2FA discovered a document on its shared server with Passlogix that detailed Passlogix's development and testing efforts specific to passive proximity.

69.    On June 14, 2007, 2FA informed Passlogix that it was infringing 2FA's intellectual property rights and was in violation of the non-compete and exclusive source

provisions of the License Agreement.

70.     The infringement of 2FA's intellectual property, Passlogix's misappropriation of 2FA's confidential information for its own purposes, and violations of the non-compete, exclusive source, and confidentiality provisions of the License Agreement continued, despite 2FA's notification.

71.     On October 24, 2007, Passlogix publically announced enhancements to v-GO SSO, v-GO AM, and v-GO SM which included CAPI and PKCS. 2FA did not participate in the development of these enhancements nor were the enhancements sourced from 2FA.

72.     The difficulties in working with Passlogix resulted in the necessity of executing four amendments to the License Agreement. The first, Amendment A, was entered into on March 1, 2007 in order to allow a means for joint development of a feature set called Active Directory as a Data Repository, and to bring the teams together and ease points of friction. At the time of signing Amendment A, Passlogix owed 2FA more than $125,000.00.

73.     In August 2007, Passlogix's executives schemed to take 2FA's intellectual property by requiring 2FA's engineers to conduct a comprehensive "code walkthrough" with Passlogix engineers. At the same time, Passlogix's executives formulated their plan to terminate their agreement and move forward independently.

74.     In September 2007, 2FA participated in a multi-day, comprehensive "code walkthrough" with Passlogix developers and engineers, during which Passlogix engineering siphoned as much intellectual property, know-how, knowledge of intricate workings of 2FA's source code, and other proprietary information, as they could from 2FA within the four-day period.

75.     On December 27, 2007, Passlogix demanded that 2FA meet to discuss alternatives to the License Agreement. The parties met on January 3, 2008, on which date Passlogix proposed paying 2FA a 2% royalty instead of the contractually agreed 25%. Passlogix also offered to purchase 2FA's intellectual property at less than 5% of the contractually agreed calculation.

76.     On May 2008, Mr. Boroditsky, Passlogix's President and CEO visited 2FA in Houston, threatening legal action against 2FA if 2FA did not agree to repay pre-paid royalties to Passlogix. Although not contractually obligated to repay Passlogix, 2FA agreed subject to specific terms and conditions.

77.     The following day, Mr. Boroditsky provided 2FA with a term sheet that would serve as the foundation of Amendment B to the License Agreement.

78.     Passlogix drafted Amendment B in May 2008.

79.     Amendment B was signed on August 8, 2008, and represented the winding down of the licensor/licensee relationship between 2FA and Passlogix, and the transition into a reseller relationship.

80.     In Amendment B, among other items, the Parties agreed to make good faith efforts to enter into a Reseller Agreement whereby Passlogix would resell the 2FA software as a stand-alone product rather than as its own branded offering, and whereby Passlogix would suggest to existing customers that they transition to 2FA for maintenance and support. Amendments C and D, executed October 7, 2008 and October 24, 2008 respectively, detailed procedural aspects of the transition.

81.     Following the execution of Amendment B, Passlogix immediately breached its contractual terms. Although Amendment B contained many obligations and several

COMPLAINT                                    15

restrictive provisions to which Passlogix was expected to comply, it appears Passlogix failed to fulfill a single contractual term.

82.     Passlogix engaged in unethical accounting practices in violation of the License Agreement, its own policy and accounting regulations by improperly allocating discounts and modifying pricing schedules, and failed to comply in a timely manner to 2FA's request to exercise its right to an audit of Passlogix's accounting practices in accordance with the License Agreement.

83.     Between October 2008 and November 2008 Passlogix presented to existing v-GO CM customers, alternative technology to replace v-GO CM and compete against v-GO CM.

84.     Passlogix developed PKCS and CAPI enhancements to its own software that included trade secrets taken from 2FA without 2FA's permission, leveraging 2FA's intellectual property while having complete, unobstructed access to 2FA's source code.

85.     Passlogix began developing a credential management system at least as early as 2008, that included trade secrets taken from 2FA without 2FA's permission, leveraging 2FA's intellectual property while having complete, unobstructed access to 2FA's source code.

86.     Eventually, the credential management system whose development was begun in 2008 would become Passlogix's v-GO UAM.

87.     In March 2010, Passlogix publically released v-GO UAM, a credential management system, in direct violation of the License Agreement's non-compete and exclusive source provisions.

88.     v-GO UAM incorporated technology misappropriated from 2FA.

89.    Passlogix was contractually obligated to return all intellectual property to 2FA prior to the termination of the Transition Period.

90.    Passlogix failed to return much of 2FA's identified intellectual property as required by Amendment B. As such, the Defendants have caused damage to 2FA's rights to dominion and control over its property, and damage to the confidential nature of the information. As a result, Defendants caused 2FA's property to greatly diminish in value and deprived 2FA of the intended uses of its intellectual property and trade secrets.

91.    In March 2010, Passlogix bundled v-GO AM with v-GO SSO and granted over 10,000,000 free licenses of v-GO SSO which contained trade secrets that were misappropriated from 2FA.

92.    In June 2010, Passlogix released a document to its partners and customers that detailed 2FA's PKCS #11 mapping technology trade secret, explaining not only how the trade secret functioned, but what a partner or customer could do to manipulate the trade secret. Specifically, Passlogix stated, "One section entry is provided for each CSP name that should be mapped to a particular PKCS11 module. There is no way to automatically detect which PKCS11 DLL to load given an arbitrary smart card, so this association is used to allow different middleware packages to be supported without additional configuration. Multiple card types can be used simultaneously, if the multiple middleware software packages can be installed without conflict." Passlogix then detailed specifically how to manipulate their software to accommodate non-supported smart cards and smart card middleware.

93.    In October 2010, Passlogix informed 2FA that it had voluntarily removed the feature subject to 2FA's misappropriation claim from its software.

94.    However, Passlogix only modified one of several components subject to 2FA's misappropriation claim and 2FA's trade secret remained exposed in both Passlogix's and Oracle's software.

95.    In late October 2010, Passlogix and Oracle granted over 2,500 current licensees (representing more than 10,000,000 licenses) software containing 2FA's misappropriated trade secrets and intellectual property.

## IX.    ORACLE

96.    Oracle Corporation claims to be the largest enterprise software company in the world. It is a publically traded company with a current market capitalization in excess of $140 billion.

97.    A component of Oracle's vast software offerings is Oracle Enterprise Single Sign-on, which until the acquisition of Passlogix, was a rebranded version of Passlogix's v-GO product line. Now, it is one of Oracle's line of products.

98.    For many years Oracle has been selling rebranded Passlogix software containing 2FA's misappropriated trade secrets.

99.    In 2010 Oracle was put on notice that it was selling rebranded Passlogix software containing 2FA trade secrets that were misappropriated by Passlogix.

100.    Oracle continues to sell rebranded Passlogix software containing 2FA's misappropriated source code as its own product.

101.    In November 2010, Passlogix sold its outstanding shares to Oracle for an estimated $42 million.

102.    Oracle cited Passlogix's strong authentication capabilities as a leading factor for acquiring Passlogix.

103.    In Oracle's press release announcing the acquisition, Mr. Amit Jasuja was quoted as saying, "Driven by regulatory mandates, organizations are being pressured to provide stronger authentication mechanisms while reducing the number of passwords required," and "Passlogix and Oracle have had a successful OEM relationship for more than three years and have many of the same customers. With the addition of Passlogix, we expect to provide a complete enterprise-scale identity management solution and be able to provide more global reach and support resources to customers."

104.    Oracle now has access to 2FA's Materials.

105.    Throughout the pendency of the previously filed lawsuit the Defendants continued to breach the License Agreement, as amended, by incorporating 2FA's Materials into other Passlogix products and violating restrictive provisions of the License Agreement, as amended, by developing new products competitive with 2FA.

106.    As a result of its actions, the Defendants violated the exclusive source, non-competition and confidentiality provisions of the License Agreement, illegally misappropriated at least one of 2FA's core trade secrets for their own commercial purposes, created a competing product in direct violation of the License Agreement, and both Defendants were unjustly enriched through the sale of Passlogix to Oracle.


### FIRST CAUSE OF ACTION
**Breach of Contract**
**(By 2FA Against Passlogix and Oracle)**

107.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

108.    In developing and implementing a credential management system even before the

2FA/Passlogix License Agreement, Passlogix breached its obligations under the License Agreement by violating the exclusive source provision of the License Agreement and Amendment B.

109.   Passlogix breached its obligations under the License Agreement by violating the non-compete provisions of the License Agreement and Amendment B.

110.   By reason of the foregoing, 2FA has been damaged as a result of Passlogix's illegal actions in amounts that will be determined at trial, but believed to be more than $10,000,000, plus interest.

## SECOND CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
(By 2FA Against Passlogix)

111.   Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

112.   Passlogix had a legal obligation to undertake its activities pursuant to the License Agreement in a manner consistent with good faith and fair dealing.  In undertaking the development of v-GO UAM in February 2008, more than five months prior to signing Amendment B, Passlogix knew or reasonably should have known that they could not or would not comply with its contractual obligations at the time of signing Amendment B.

113.   Passlogix knowingly used 2FA's Materials to gain a commercial advantage.

114.   By reason of the foregoing, 2FA has been damaged as a result of Passlogix's illegal actions in amounts that will be determined at trial, but believed to be more than $10,000,000, plus interest. In addition, 2FA requests an award of punitive damages to be determined at trial.

## THIRD CAUSE OF ACTION
### (Misappropriation)
By 2FA Against Defendants

115.    Plaintiff incorporates by reference each of the allegations in the preceding

paragraphs of this Complaint as though fully set forth here.

116.    Plaintiff created and owned a 2FA's PKCS #11 mapping trade secret.

117.    Plaintiff protected the specific 2FA's PKCS #11 mapping trade secret from public

access.

118.    Plaintiff provided Passlogix with access to the trade secret under restrictive

confidentiality, non-disclosure, and other protective and restrictive agreements.

119.    Passlogix unlawfully misappropriated 2FA's PKCS #11 mapping trade secret and

incorporated it into their v-GO Single Sign-On, Oracle eSSO Logon Manager, and v-GO

Universal Authentication Manager products for their commercial advantage, and such

conduct was intentional, willful, wanton and malicious.

120.    Oracle has been and continues to sell software misappropriated from 2FA, even

after being notified by 2FA of its illegal actions. Such conduct was intentional, willful,

wanton, and malicious.

121.    By reason of the foregoing, 2FA has been damaged as a result of Passlogix's and

Oracle's illegal actions in amounts that will be determined at trial, but believed to be

more than $10,000,000, plus interest. In addition, 2FA requests an award of punitive

damages to be determined at trial.

## FOURTH CAUSE OF ACTION
### Criminal Possession of Stolen Property in the First Degree – NY CLS Penal § 165.54
(By 2FA Against Oracle)

122.    Plaintiff incorporates by reference each of the allegations in the preceding

paragraphs of this Complaint as though fully set forth here.

123.   Oracle violated NY CLS Penal § 165.54, through its acquisition of Passlogix on November 1, 2010. Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

124.   At the time of the acquisition Oracle knew, or should have known, that a portion of the property it was acquiring was stolen from 2FA, which is the owner of the stolen property.

125.   Oracle remains in possession of the stolen property and has not returned the stolen property to 2FA.

126.   Oracle acquired the stolen property with the intent to benefit itself through the creation of a "...complete enterprise-scale identity management solution and be able to provide more global reach and support resources to [its] customers."

127.   Oracle acquired Passlogix for an estimated $42 million.

128.   The value of the stolen property exceeds one million dollars.

129.   As a direct and proximate result of Oracle's unlawful conduct, Oracle has caused damage to 2FA in an amount to be proven at trial.

130.   Oracle's actions were done with the deliberate intent to injure 2FA's business, impede 2FA's recovery of its stolen property, and improve its own commercial advantage. 2FA is therefore entitled to punitive damages.

131.   By reason of the foregoing, 2FA has been damaged as a result of Oracle's illegal actions in amounts that will be determined at trial, but believed to be more than $10,000,000, plus interest. In addition, 2FA requests an award of punitive damages to be determined at trial.

132.    2FA has also suffered irreparable injury from these acts, and due to the continuing threat of such injury, has no adequate remedy at law, entitling 2FA to injunctive relief.

### FIFTH CAUSE OF ACTION
**Unfair Competition**
(By 2FA against Defendants)

133.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

134.    Defendants have engaged in unlawful business practices by committing acts including misappropriation, criminal possession, trespass, conversion, negligent interference with business relationships, and other illegal acts and practices as alleged above, all in an effort to gain unfair competitive advantage over 2FA.

135.    These unlawful business acts or practices were committed pursuant to business activity related to providing business applications software, services, and related support and maintenance for that software.

136.    The acts and conduct of Defendants constitute fraudulent, unlawful, and unfair competition as defined by New York State common law unfair competition.

137.    Defendants' unfair business practices have unjustly minimized 2FA's competitive advantage and have caused and are causing 2FA to suffer damages.

138.    Defendants' actions were fraudulent, deceptive and dishonest.

139.    By reason of the foregoing, 2FA has been damaged as a result of Passlogix's illegal actions in amounts that will be determined at trial, but believed to be more than $10,000,000, plus interest.

140.    As a result of such unfair competition, 2FA has also suffered irreparable injury.

COMPLAINT                          23

Defendants have improperly and unlawfully taken commercial advantage of 2FA's investment in its confidential and intellectual property.

## SIXTH CAUSE OF ACTION
### Conversion
### (By 2FA Against Defendants)

141.    2FA incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

142.    Instead of paying 2FA for the use of its property, Defendants intentionally and willfully took possession of 2FA's property, including, but not limited to, 2FA's PKCS #11 trade secret.

143.    Defendants failed to comply with their obligation to return 2FA's identified intellectual property in a accordance with Amendment B, such property included, but was not limited to source code, trade secrets, 2FA's confidential, proprietary, and copyrighted information and documentation, all of which belonged to 2FA.

144.    This Materials and property is the sole and exclusive property of 2FA. 2FA has an exclusive right to possession and distribution of such property, which is valuable to 2FA.

145.    2FA at no time consented to Defendants' copying, downloading, removal, retention, or distribution of such property.

146.    Defendants have obtained substantial benefit from the illegal access to and from the sale and distribution of 2FA's property without paying 2FA for the value of such property.

147.    Defendants' improper assumption and exercise of dominion and control over 2FA's property and their sale and distribution of the same has and will continue to interfere with and diminish 2FA's rights in that property.

148.    As a direct and proximate result of Defendants' actions, 2FA has lost, and will continue to lose revenues and profits from potential purchasers of 2FA's software, services, and maintenance and support, in an amount to be determined at trial. Defendants' wrongful conduct was a substantial factor in causing this harm.

149.    As a result of such unfair competition, 2FA has also suffered irreparable injury. Defendants have improperly and unlawfully taken commercial advantage of 2FA's investment in its confidential and intellectual property.

## SEVENTH CAUSE OF ACTION
### Trespass to Chattels
(By 2FA Against Defendants)

150.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

151.    At all times mentioned in this Complaint, 2FA had legal title or license to and actual possession of 2FA's intellectual property and trade secret, embodied in documentation and source code, as described above.

152.    Defendants intentionally interfered with 2FA's use or possession of both 2FA's intellectual property and trade secret, embodied in documentation and source code.

153.    Defendants' trespass and interference proximately caused damage to 2FA, including, but not limited to, damage to 2FA's rights to dominion and control over its property, and damage to the confidential nature of the information. As a result, Defendants caused 2FA's property to greatly diminish in value and deprived 2FA of the intended uses of its intellectual property and trade secret.

154.    2FA is entitled to recover any and all damages it sustained as a result of such trespass, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment / Restitution
By 2FA Against Defendants)

155.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

156.    Defendants unjustly received monetary and non-monetary benefits at the expense of 2FA through the receipt of stolen property and Passlogix's wrongful conduct, including Passlogix's: breach of contract, unfair business practices, and misappropriation of 2FA's intellectual property and trade secrets.

157.    Oracle continues to unjustly retain these benefits at the expense of 2FA.

158.    By reason of the foregoing, 2FA has been damaged as a result of the Defendants' illegal actions in amounts that will be determined at trial, but believed are to be more than $100,000,000.00 plus interest.

## NINETH CAUSE OF ACTION
### Civil Conspiracy
(By 2FA Against All Defendants)

159.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

160.    Defendants willfully, intentionally, and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct, including Defendants' breach of contract, misappropriation, criminal possession, and other unfair business practices, as well as Defendants' trespass on, and conversion of 2FA's PKCS# 11 trade secret, source code, and other proprietary and confidential information.

161.    Defendants undertook actions in furtherance of that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of each other.

162.   As a direct and proximate result of the acts in furtherance of the conspiracy, 2FA has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of 2FA's licenses, consulting services, and maintenance and support for 2FA's software programs. The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

163.   By reason of the foregoing, 2FA has been damaged as a result of the Defendants' illegal actions in amounts that will be determined at trial, but believed are to be more than $10,000,000.00 plus interest.

164.   Defendants' intentional agreement to commit, and commission of, these wrongful acts was willful, malicious, oppressive, and in conscious disregard of 2FA's rights, and 2FA is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

**TENTHTH CAUSE OF ACTION**
**Aiding and Abetting**
(By 2FA Against All Defendants)

165.   Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

166.   As fully described above, Defendants had full knowledge or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including but not limited to breach of contract, misappropriation, criminal possession, and other unfair business practices, as well as Defendants' trespass on, and conversion of 2FA's PKCS #11 mapping trade secret, source code, and other proprietary and confidential information, by providing substantial assistance and/or encouraging the others to act.

167.    Defendants also aided and abetted the described wrongful conduct of the other Defendants by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

168.    As a direct and proximate result of the aiding and abetting of these acts, 2FA has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of licenses, consulting services, and maintenance and support contracts to 2FA's software programs. The wrongful conduct aided and abetted by the Defendants was a substantial factor in causing this harm.

169.    By reason of the foregoing, 2FA has been damaged as a result of the Defendants' illegal actions in amounts that will be determined at trial, but believed are to be more than $10,000,000.00 plus interest.

170.    Defendants' aiding and abetting of these wrongful acts was willful, malicious, oppressive, and in conscious disregard of 2FA's rights, and 2FA is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

## ELEVENTH CAUSE OF ACTION
### An Accounting
(By 2FA Against All Defendants)

171.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

172.    Since at least April 24, 2006, Defendants have obtained commercial advantage through the use of unlawful conduct including, but not limited to: (a) breaching the 2FA/Passlogix License Agreement; (b) negligently interfering with 2FA's prospective economic advantage with its existing and potential customers; (c) improperly, willfully,

and unlawfully taking commercial advantage of the investment made by 2FA in its software for the purpose of sabotaging 2FA's ability to do business and compete in the marketplace in furtherance of their unlawful and deceptive schemes.

173.    Defendants have received financial gain as a result of their misconduct, at the expense of 2FA, and some or all of such financial gain is rightfully due 2FA.

174.    The amount of money due from Defendants to 2FA is unknown to 2FA and cannot be ascertained without an accounting of the revenue Defendants have obtained through their wrongful and unlawful conduct. 2FA is entitled, therefore, to a full accounting.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following:

A.    For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

> (1) selling, distributing, or using any Materials and proprietary information obtained from 2FA, including without limitation, 2FA's confidential, proprietary, and software, data, internal documents, updates, patches, fixes, and other computer code; and

> (2) otherwise engaging in acts of unfair competition and interference with 2FA's business relationships; and

B.    An order requiring Defendants to file with the Court and serve on 2FA within thirty (30) days after the service on Defendants of such injunction a report in writing, under oath, setting forth in detail the manner and form in which Defendants have

complied with the injunction;

C.      An Order directing Defendants to return 2FA's property, including, without limitation, 2FA's confidential, proprietary, software, including data, internal documents, and valuable updates, patches, fixes, and other computer code that Defendants have taken from 2FA;

D.      Damages in amounts proven at trial;

E.      Punitive damages in a sum to be determined at trial, on the basis of Defendant's willful and deliberate misappropriation, breach of the covenant of good faith and fair dealing, criminal possession, aiding and abetting and conspiracy;

F.      Restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Defendants through the acts complained of herein, including but not limited to disgorgement and/or restoration any and all revenues, earnings, profits, compensation, and benefits obtained from their illegal actions.

G.      The establishment of a constructive trust consisting of the benefits conferred upon the Defendants from the revenues and marketplace position derived from its wrongful conduct at the expense of 2FA as alleged above, and all profits derived from that wrongful conduct.

H.      Prejudgment interest;

I.      An accounting;

J.      Attorneys' fees and costs; and,

K.      For such other relief as this Court deems just and proper.


Plaintiff requests a jury in this matter.


COMPLAINT                              30

Dated: 12/29/10

EPSTEIN DRANGEL LLP

By: _____
Jason M. Drangel (JMD 7204)
Attorneys for Plaintiff
60 East 42nd Street
Suite 2410
New York, NY 10165
Tel: 212-292-5390
Fax: 212-292-5391


*Pro Hac Admission Pending*
Laurence Singer (LS 4250)
Attorney at Law
1629 K Street NW, Suite 300
Washington D.C. 20006
646 327-8772

COMPLAINT                    31